COMMONWEALTH vs. RAYMOND CHAMPAGNE
(and a companion case[1]).

Norfolk.  September 10, 1986. — January 20, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Grand jury proceedings, Required finding,
Judicial discretion, Suppression of evidence by prosecutor, Disclosure
of evidence, New trial, Assistance of counsel. *Grand Jury. Due Process
of Law,* Grand jury proceedings. *Joint Enterprise. Evidence,* Prior incon-
sistent statement, Exculpatory.

In a grand jury proceeding in which a murder indictment against an inmate
    at M.C.I., Cedar Junction, was returned, the evidence received by the
    grand jury, consisting entirely of hearsay, in the circumstances was
    sufficient to support the indictment. [82-83]
The integrity of a grand jury proceeding in which a murder indictment
    against an inmate at M.C.I., Cedar Junction, was returned, was not
    impaired by testimony of the investigating State trooper, in response to
    a question from a grand juror, that the three or four people involved in
    the murder in question had been suspected of attacks on other prisoners,
    where the record was clear that the prosecutor and the witness did not
    intentionally undertake to present this information to the grand jury in
    order to procure an indictment and, in any event, the defendant did not
    show that the information was likely to have made a difference in the
    grand jury's decision to indict him. [83-84]
A claim by a defendant convicted of murder, that the grand jury testimony
    which his indictment was based was known to the Commonwealth and
    its agents to be false, which claim was presented on the defendant's
    second motion for postconviction relief, was not timely under Mass. R.
    Crim. P. 30 (c) (2), and, in any event the defendant made no showing
    that any agent of the Commonwealth knew that the grand jury had been
    given false information. [84-85]
At the trial of three inmates at M.C.I., Cedar Junction, for the murder of
    another prisoner, the evidence was sufficient to warrant a verdict of first
    degree murder on a joint venture theory against one of the inmates,
    where the facts reasonably warranted an inference that the inmate had
    shared premeditated malice aforethought with the others with respect to
    a physical assault by three men on the victim, whether or not the jury
    reasonably could have inferred that the inmate in question had known
    that one or more of his joint venturers had a weapon. [85-87]

---

[1] Commonwealth *vs.* Ronald Hogan.

At the trial of a murder case against three inmates at M.C.I., Cedar Junction, the judge did not abuse his discretion in permitting the impeachment by the Commonwealth of its own witness, another inmate, by his prior inconsistent statement, even though the prejudice to the defendants in the admission of the statement possibly exceeded the statement's worth for impeachment purposes, where the testimony of the witness during cross-examination by defense counsel, that an agent of the Commonwealth had offered the witness money to testify, was a serious charge against the prosecution entitling it to seek to show, through the means of impeachment selected, that the witness was untruthful at trial. [87-89]

Two inmates at M.C.I., Cedar Junction, convicted of the murder of another prisoner were not entitled to a new trial on the ground that the prosecution had failed to disclose a metal pick approximately twelve inches long with the diameter of a standard pencil and sharpened to a point, which was found in trash on the day of the killing and which tested positively for blood, inasmuch as whether the pick could have been found to have been the murder weapon or not, it would not have been evidence exculpatory of the defendants. [89-90]

At the trial of an inmate at M.C.I., Cedar Junction, for the murder of another prisoner, his attorney's failure to introduce evidence of the discovery of a metal pick in a codefendant's cell the day after the killing did not show ineffectiveness of counsel in a constitutional sense. [91]

This court concluded that two prison inmates convicted of the first degree murder of another prisoner were not entitled to relief under G. L. c. 278, § 33E, even though the Commonwealth's case had been relatively weak, dependent on various inferences and the testimony of certain witnesses whose credibility was questionable, and even though another inmate involved in the murder, who had been found incompetent to stand trial with these defendants, had been subsequently permitted to plead guilty to manslaughter. [92]

INDICTMENTS found and returned in the Superior Court Department on January 9, 1979.

The cases were tried before *Robert V. Mulkern*, J., and motions for a new trial were heard by him.

*Ellen A. Howard*, Committee for Public Counsel Services, for Raymond Champagne.

*Edward J. McCormick, III*, for Ronald Hogan.

*Charles J. Hely*, Assistant District Attorney (*Stephanie Martin Glennon*, Assistant District Attorney, with him) for the Commonwealth.

*John M. Russell, Jr.*, for James Gallo, submitted a brief.

WILKINS, J. The defendants, inmates in the State prison at Walpole (now Cedar Junction), were convicted in August, 1979, of murder in the first degree of a fellow inmate, Stephen L. Curvin.[2] The defendants raise a variety of issues, some advanced individually and others advanced jointly. The issues arise both on appeals from the convictions and on appeals from the denial of posttrial motions. We affirm the convictions and decline, pursuant to G. L. c. 278, § 33E (1984 ed.), to order that the verdicts be reduced or a new trial be held.

The victim died of multiple stab wounds inflicted by a sharp instrument or instruments on the night of November 15, 1978, in a cell on the flats, or bottom level, of cell block one (block B1) of the prison. The evidence warranted the conclusion that the victim, who had been stabbed in the cell of inmate Ronald Roberts, staggered down the flats toward a desk in front of a closed grillwork door where a correction officer was on duty. The victim was removed from the cell block and died shortly thereafter. Bloodstained pants were found in Champagne's cell, which was next to Roberts's cell, the cell where the stabbing took place. As will appear more fully later, Roberts's testimony tended to establish Hogan's guilt. Another inmate, James Bernadini, gave testimony particularly incriminating of Champagne, including an admission by Champagne that he had stabbed the victim. Additional facts will be presented with respect to particular issues.

1. Champagne objects to the sufficiency of the grand jury evidence to support the indictment against him. The grand jury received evidence, all hearsay, on January 9, 1979.[3] The case against Champagne was based on a report of a medical examiner

---

[2] Two other inmates were also indicted for the murder. One of them, James Gallo, who was also found guilty, is deceased. The fourth indicted inmate, one Flaherty, was not tried with the others and later pleaded guilty to manslaughter.

[3] This was before the issuance of this court's opinion in *Commonwealth v. St. Pierre,* 377 Mass. 650, 655-656 (1979), raising questions concerning the use of hearsay testimony before grand juries in certain circumstances, and also before our more recent opinion of *Commonwealth v. McCarthy,* 385 Mass. 160, 163 (1982), dismissing an indictment which was not based on evidence sufficient to establish probable cause to arrest the defendant.

as to the cause of death and the testimony of John Nasuti, a State trooper assigned to the office of the district attorney.

The grand jury evidence involving Champagne was unquestionably thin. According to his grand jury testimony, Nasuti obtained his information from two inmate informants who lived in block B1 of the maximum security section of the prison. Around 8:30 P.M. on the night of the killing Flaherty told one inmate that he was going to stab the victim and that the inmate should leave his cell or get the victim out of the cell into another one. The inmate left his cell and went to another area. About 9 P.M., according to one source, three individuals, not including Champagne, went to that cell, in which the victim was stabbed. Only one informant gave information as to Champagne's presence. He saw Champagne go into the cell as the scuffle was taking place.

In the circumstances the grand jury reasonably could have inferred that Champagne was in the cell or the immediate vicinity of the cell in which the stabbings occurred and that, for fear of being caught or identified, the persons involved permitted only participants in the commission of the crime to be present. The grand jury were warranted in concluding that this was probably not a situation in which Champagne was merely present in the cell or its vicinity.[4]

Champagne also complains that the integrity of the grand jury was impaired in violation of his State and Federal due

---

[4] Champagne does not argue that the grand jury testimony fails to show the reliability of the informants. In certain other situations, where probable cause determinations must be based on information from an informant, we have required a showing of the credibility of the informant or the reliability of his information. See *Commonwealth v. Borges*, 395 Mass. 788, 794-795 (1985) (question of probable cause to arrest); *Commonwealth v. Upton*, 394 Mass. 363, 375 (1985) (probable cause to search). Cf. *Commonwealth v. Bowden*, 379 Mass. 472, 477 (1980) (ordinary witness to a crime is not an "informant"). We are not aware of any case that, in so many words, brings the veracity test into consideration in deciding the adequacy of grand jury hearsay evidence to support an indictment. The principle may not, however, be far from that suggested by Justice Kaplan in *Commonwealth v. St. Pierre*, 377 Mass. 650, 656 (1979) ("the credit reasonably attaching to particular hearsay may fall so low as to invalidate [an indictment]"). Where the informant is a grand jury witness, of course, the grand jurors themselves can pass judgment on the veracity of his testimony.

process rights and his right under art. 12 of the Massachusetts Declaration of Rights to an unbiased grand jury. This argument is based on the colloquy between a grand juror and the investigating State trooper which is set forth in the margin.[5] Champagne claims prejudice in the witness's statement that the three or four people involved here had been suspected of attacks on other prisoners. This statement was made in response to a question from a grand juror. The record is clear that the prosecutor and the witness did not intentionally undertake to present this information to the grand jury in order to procure an indictment. See *Commonwealth* v. *Mayfield,* 398 Mass. 615, 621 (1986). The prejudicial portion of the answer is not unresponsive, although it would not have been admissible at a trial. The answer suggested some weakness in the Commonwealth's case against Champagne because it showed that Champagne might reasonably have been only a suspect and that he had no motive to kill the victim.

The standard for determining whether grand jury bias entitles a defendant to relief is more strict than that applied to the bias of a petit jury. See *Commonwealth* v. *McLeod,* 394 Mass. 727, 732-733, cert. denied sub nom. *Aiello* v. *Massachusetts,* 474 U.S. 919 (1985). Champagne has not shown that presentation of information that he and others had been suspected of previous attacks on inmates was likely to have made a difference in the grand jury's determination to indict him. See *Commonwealth* v. *Mayfield, supra* at 621-622.

Champagne belatedly argues that the grand jury testimony on which his indictment was based was known to the Commonwealth and its agents to be false. The claim is that the informant, one Butler, who, Nasuti testified, saw Champagne enter the

---

[5] THE PROSECUTOR: "Any further questions?"
THE JUROR: "Basically, this started as a grudge between two men?"
A.: "Allegedly, sir —"
THE JUROR: "That happened years ago. Now, how did the other two get involved?"
A.: "That I do not know, except to say that the three or four people involved here have been suspected of this type of thing before within the institution. And as far as the grudge is concerned, we don't even know if there's a basis for that."

cell in which the stabbing took place, was in a location in the cell block from which he could not have seen what he was said to have seen. This argument was not presented in support of the initial motion to dismiss the indictment, but was advanced in Champagne's second motion for postconviction relief which this court remanded for consideration by the trial judge. The trial judge concluded that, although the informant's trial testimony did not fully support the statements attributed to him before the grand jury, there was nothing to show that the investigating officer knowingly presented false testimony to the grand jury.[6] Nor was there any showing that at any time the prosecutor or any agent of the Commownealth knew that the grand jury had been given false information. Irreconcilable inconsistencies between trial evidence and evidence presented to the indicting grand jury are not sufficient by themselves to warrant dismissal of an indictment.

In any event, the claim that the Commonwealth presented false testimony to the grand jury should have been presented, if it was worth presenting at all, at least at the time of the filing of the defendant's first motion for postconviction relief. See Mass. R. Crim. P. 30 (c) (2), 378 Mass. 900 (1979). This court will be most strict in requiring timely challenges to indictments based on the asserted impairment of the grand jury process.

2. Hogan argues that the evidence did not warrant his conviction and that his motion for a required finding of not guilty, filed at the close of the Commonwealth's case against him, should have been allowed. In testing the sufficiency of the Commonwealth's evidence, we apply that standard set out in *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979).

We summarize the evidence which could have satisfied a rational trier of fact that, as a joint venturer, Hogan participated in or aided in the attack on Curvin. Shortly before the attack

---

[6] There was evidence that, if the informant had been on the third tier of the cell block, as he said at trial, he could not have seen anything close to or in the cell on the first tier where the victim was attacked. The informant may have been truthful about what he saw but not truthful about where he was when he saw it.

Hogan called Ronald Roberts out of his cell. They were joined by Flaherty and Gallo. Flaherty told Roberts that he had a "beef" with Curvin "from the streets" and that he wanted to go in and "buff" Curvin up and added: "[I]t's going to take three of us to go in the room." Hogan said, "I know Ronny [Roberts] for a while," and "I can trust him." Gallo told Roberts that, if he did not want the "beef" to "go down" in his cell, "to move the guy to [Gallo's] room." Following this exchange Hogan, Gallo, and Flaherty went into Champagne's cell and then upstairs. There was evidence that Hogan was in Champagne's cell with Flaherty, Gallo, and Champagne immediately after the assault and that it looked like Hogan was taking off his clothes. Roberts testified that, after he had returned to his cell shortly after the assault, he heard Hogan from cell 13 request, "Ronny, send over a pair of pants," and also say: "[W]e'll find out who the rat is now." From this the jury could have concluded that Hogan had been present at the assault and was then trying to conceal his participation. Likewise, the testimony of correction officer Evans that he saw Hogan, Gallo, and a third inmate running up the cell block stairs, if credited, could be viewed as evidence of Hogan's consciousness of participation. Although the inference from these facts is not compelled, the jury could reasonably have found that Hogan was a joint venturer with at least Flaherty and Gallo in a plan to assault Curvin, and that Hogan assisted in carrying out the plan at least by calling Roberts out of his cell in an attempt to isolate Curvin in the cell.

The further question is whether, although Hogan could have been reasonably found to have participated in the joint venture, the evidence warranted, on the standard of the *Latimore* case, a verdict of murder in the first degree. "The theory underlying joint enterprise is that one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal." *Commonwealth* v. *Soares,* 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). See *Commonwealth* v. *Blow,* 370 Mass. 401, 407-408 (1976); *Commonwealth* v. *Richards,* 363 Mass. 299, 307-308 (1973). To be convicted .

of murder on a joint venture theory "[a] joint venturer need only intend that the victim be killed or know that there is a substantial likelihood of the victim's being killed." *Commonwealth* v. *Podlaski,* 377 Mass. 339, 347 (1979). "The jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares, supra.*

The facts reasonably warrant an inference that Hogan shared premeditated malice aforethought with the others with respect to a physical assault by three men on another inmate. It does not matter, to sustain a conviction of murder in the first degree in this case, whether the jury reasonably could have inferred that Hogan knew that one or more of his joint venturers had a weapon. The crime involved a planned, direct, vengeful assault by three men in a confined area. The jury could infer that there was a plain and strong likelihood that death would follow the contemplated attack. See *Commonwealth* v. *Casale,* 381 Mass. 167, 171-172 (1980); *Commonwealth* v. *Chance,* 174 Mass. 245, 252 (1899). In a similar prison homicide case, we upheld denials of motions for directed verdicts on indictments charging murder in the first degree. *Commonwealth* v. *Campbell,* 378 Mass. 680, 688-689 (1979).

3. The defendants challenge the introduction, for impeachment purposes only, of a statement inmate Benjamin Butler made to Trooper Nasuti shortly after the murder. Butler testified that on the night of the killing he was an inmate of block B1. Shortly after 9 P.M., he entered the block and climbed the stairs to the third floor where his cell was located. He looked down on the flats and saw lots of people. Of the people in the courtroom, he recognized only Champagne, who came from the front door of the cell block and disappeared under the tier. On cross-examination by Champagne's counsel, Butler testified that Trooper Nasuti had offered him $1,500 to testify in this proceeding.

During direct examination, the prosecutor had shown Butler a written statement, which Butler read to himself and then ackowledged was a statement he had given to Trooper Nasuti. Butler testified that some of what he read was not what he had

told Nasuti and that he had given the statement in order to get out of Walpole prison. He said that he could not now identify anyone who was in front of the cell in which the victim was attacked at approximately 9 P.M. on November 15, 1978, and that no one in the courtroom was there at that time.

After Butler's testimony was concluded, the trial judge admitted Butler's statement for impeachment purposes only. He concluded that the prosecution had satisfied the procedural requirements of G. L. c. 233, § 23 (1984 ed.), so as to warrant impeachment of its own witness. The judge concluded that Butler's statement was inconsistent with his testimony and decided that the Commonwealth was entitled to confront Butler's testimony that Trooper Nasuti "in substance" offered Butler a bribe. With exquisite care, both before and immediately after the statement was read, the judge explained the limited purpose for which the statement was admitted in evidence. He returned to the subject in his charge to the jury.

We agree that the requirements of G. L. c. 233, § 23, were met. The entire statement was inconsistent with Butler's trial testimony. Butler acknowledged the statement as his, had an opportunity to explain it, and attributed factual errors to his desire to be transferred from the Walpole prison.

Butler's statement, which is set forth in the margin,[7] could have been prejudicial to the defendants, even though it was

---

[7] "On November 15, 1978, about 9 p.m., I recall seeing Jimmy Gallo, Rocky Hogan, Ray Champagne and Stephen Curvin in the middle of the flats on Block 1. I was standing on the third tier glancing down and I saw Rocky Hogan and Curvin go into Room 14, walking into Room 14, and a moment or two later, Gallo and Champagne followed them in. I heard sounds of a commotion within the cell and about a minute later, Curvin came running like out of Room 14. I saw Gallo follow him and I saw Gallo stick him in the left side of the back. He was bleeding. Gallo, in almost a continual motion, went toward the gallery wall, turned left and walked all the way up to the end and went upstairs.

"I ran down the stairs from where I was to the flats and looked down toward Room 14. Michael Flaherty was walking toward me from that room area. He was wearing a blue sweatsuit and he had it folded over in the front, holding onto it like he was hiding something. Flaherty walked up to the steps. I was standing in the flats near the officer's desk only about five or ten feet from him. I saw that he had blood on his left sleeve and also I saw blood on the lower left side of the jersey or top part of his sweatsuit. I did not see Hogan or Champagne at that time. I did not see them come out of the room either."

admitted solely for impeachment purposes. This court has rec-
ognized that in certain circumstances a jury may not be capable
of giving effect to limiting instructions. See *Commonwealth*
v. *Daye,* 393 Mass. 55, 72 (1984).

We reject the argument that the statement was incurably
prejudicial, and we further conclude that the judge's determi-
nation to admit Butler's prior inconsistent statement was not
an abuse of discretion. Butler's testimony that an agent of the
Commonwealth had offered him money to testify was a serious
charge against the prosecution. For this reason, the prosecution
was particularly entitled to seek to show, through the means
of impeachment selected, that Butler was untruthful at trial.
If Butler had not made the allegation against the Common-
wealth, admission of the statement might have been an abuse
of discretion because the weight of the prejudice in the admis-
sion of the statement possibly exceeded the statement's pro-
bative worth for impeachment purposes, assuming, as here,
the statement was not admitted or admissible in evidence as
tending to prove the crimes. See *Commonwealth* v. *Daye,*
*supra* at 70-72.

4. The defendants argue that they are entitled to a new trial
because the prosecution failed to disclose potentially exculpa-
tory evidence. A weapon, described as a metal pick approxi-
mately twelve inches long with the diameter of a standard
pencil and sharpened to a point, was found on the day of the
homicide in trash which may have been located on the flats
of cell block B1. The weapon, which tested positively for
blood, was mistakenly placed in an evidence bag concerning
another homicide at the prison. The error was not discovered
before the jury began their deliberations. The defendants argue
that the pick was exculpatory evidence that could have been
used to impeach James Bernadini.

Evidence is exculpatory, for the purpose of assessing whether
the prosecution should have disclosed it, if it tends to support
the innocence of the accused. *Commonwealth* v. *Ellison,* 376
Mass. 1, 22 n.9 (1978). We see no error, on this record, in
the judge's ruling that the pick would have been inculpatory
and not exculpatory. Hogan argues in his brief that the pick was

"very likely the murder weapon," because of where and when it was found, because it had traces of blood on it, and because "[t]he wounds of the victim apparently could have been caused by an instrument of this sort." Champagne's brief adopts Hogan's argument on the exculpatory evidence issue, making certain additional points. The judge concluded that the pick could have caused the victim's wounds, based on his view of the medical examiner's testimony. If we were to accept the conclusion that the pick was, or very likely was, used in the murder, it is difficult to develop any theory on how either defendant could have used it in an exculpatory way. The pick substantially conformed to the description Bernadini gave of the pick he saw in Champagne's hand shortly before the killing. The only discrepancy was the length of the taper of the point, a matter not likely to have had any effect in an attempted impeachment of Bernadini. Except for general assertions that investigation might have turned up something, the defendants do not indicate how the availability of the pick would have aided their cases.

Champagne argues additionally, and inconsistently with Hogan's argument, that the pick could not have caused the wounds and that, if it was not the murder weapon, the pick could have been exculpatory. The factual premise of this argument is not demonstrated on this record, which includes no posttrial medical evidence concerning the pick and the wound received. Just as we would have trouble concluding on the record that the pick could have caused some or all of the victim's stab wounds, we would have trouble concluding that the pick could not have caused any of those wounds. Champagne has not made his case that the pick would have been evidence exculpatory of his guilt. We need not, therefore, reach the question whether, if the pick had been exculpatory, either defendant has shown that level of likely prejudice that requires a new trial. See *Commonwealth* v. *Gallarelli, ante* 17 (1987).[8]

---

[8] Hogan made no request for exculpatory evidence and filed no other motion that might have brought the pick forth. Champagne filed a general

5. After Champagne's appeal was entered in this court, he filed a motion here (see G. L. c. 278, § 33E) seeking a new trial (if the indictment were not dismissed) on the ground that the Commonwealth failed to disclose further allegedly exculpatory evidence. We remanded the motion for consideration by the trial judge. The new evidence claim related to the alleged posttrial disclosure that another pick had been found the day after the killing, this time in Hogan's cell. The trial judge warrantably concluded that the prosecutor advised Champagne's counsel of the fact of the discovery shortly before the jury were empanelled. Neither this pick nor the fact of its discovery was introduced in evidence at the trial. We see no ineffectiveness of Champagne's counsel, in a constitutional sense, in not bringing out the fact of the discovery of a weapon in a codefendant's cell.

6. We dispose of the several remaining issues by brief comment. (a) The defendant's argument that the judge should have charged the jury on voluntary manslaughter, a point not raised below, lacks merit because no view of the evidence would support a verdict of guilt of manslaughter. (b) Champagne does not make a persuasive case that the conduct of correction officers at the Walpole prison during the trial denied him a fair trial. It is doubtful that the point was preserved for review. The judge considered the facts concerning the denial to Champagne of his best clothes and his medication and other alleged mistreatment. Counsel did not assert that his client was unable to aid him in the trial nor did he seek a mistrial. (c) The defendants object to the judge's reference in his charge to rebutting "the natural presumption of malice" that could be inferred from the wrongfulness of the taking of the life of another. In light of the entire charge, the reference to "presump-

motion for exculpatory evidence and a motion to inspect "all items of tangible physical evidence gathered with respect to the investigation of the subject matter of said indictment (so-called 'real evidence')" and to receive copies of all reports relating to any such item. In a case governed by the standards of G. L. c. 278, § 33E, and where disclosure of the pick to Champagne's counsel would have come to the timely attention of Hogan's counsel, we would grant Hogan whatever benefit Champagne's motions had.

tion" did not mislead the jury as to the burden on the Common-
wealth to prove every element of the crime beyond a reasonable
doubt. *Commonwealth* v. *Medina,* 380 Mass. 565, 578 (1980).
The judge gave a supplemental instruction in response to coun-
sel's objection to allegedly burden-shifting language, and the
defendants raised no further objection. Malice was not, in any
event, an issue at trial. See *Commonwealth* v. *Drayton,* 386
Mass. 39, 53 (1982). (d) In view of all the evidence, including
the testimony of Bernadini, which includes an admission by
Champagne that he stabbed the victim, Champagne's motion
for a required finding of not guilty was properly denied.

7. There is not basis on which the defendants are entitled
to relief under G. L. c. 278, §33E. Although, quite clearly,
the Commonwealth's evidence presented a relatively thin case,
dependent on various inferences and the testimony of certain
witnesses whose credibility was questionable, guilty verdicts
were returned which we have said were warranted and not
infected by an error of law. Even if the fact that Flaherty was
subsequently permitted to plead guilty to manslaughter could
be a consideration under G. L. c. 278, § 33E, in favor of
reducing the defendants' verdicts to murder in the second de-
gree, the circumstances of the case against Flaherty, including
his incompetence to stand trial with these defendants, may
have justified the difference in the sentences and the willingness
of the Commonwealth to accept a plea of guilty to the lesser
offense.

*Judgments affirmed.*

*Orders denying motions for
a new trial affirmed.*