COMMONWEALTH vs. JOSEPH FREEMAN.

Suffolk. March 6, 1990. - April 17, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Rape. Grand Jury. Due Process of Law*, Grand jury proceed-
ings. *Practice, Criminal*, Grand jury proceedings, Instructions to jury.
*Insanity*.

In a murder case, the integrity of the grand jury proceedings was not im-
paired by a police officer's truthful response to a grand juror's question
referring to the defendant's criminal record, where the defendant did
not show the information was furnished with the intention of obtaining
the indictments or that the comments made a difference in the grand
jury's determination to indict him. [281-284]
There was no substantial likelihood of a miscarriage of justice at a murder
trial by reason of the judge's failure to instruct the jury on involuntary
manslaughter and on the issue of criminal responsibility, where the de-
fendant in furtherance of his trial strategy neither requested any such
instructions nor objected to the instructions given. [284-287]

INDICTMENTS found and returned in the Superior Court
Department on November 4, 1986.

The cases were tried before *Robert S. Prince, J.*

The case was submitted on briefs.

*Randolph Gioia* for the defendant.

*Newman Flanagan*, District Attorney, *Daniel M.
Marposon & Daniel C. Mullane*, Assistant District Attor-
neys, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the
defendant of murder in the first degree, forcible rape of a
child under the age of sixteen, and assault and battery.[1] On
appeal, the defendant argues: (1) that it was error to deny

---

[1]The jury acquitted the defendant on an indictment charging assault
with intent to commit murder.

his pretrial motion to dismiss the murder and rape indictments because of the introduction of allegedly improper evidence before the grand jury; and (2) that the trial judge's failure to instruct the jury on involuntary manslaughter and on criminal responsibility creates a substantial risk of a miscarriage of justice. The defendant also asks that we exercise our power under G. L. c. 278, § 33E (1988 ed.), to order a new trial in the interests of justice. We affirm the judgments of conviction and find no basis to exercise our power under G. L. c. 278, § 33E.

There was evidence from which the jury could have found the following facts. On the evening of September 9, 1986, Cheryl Thompson was at home with her three children: three year old Jane (victim), two year old Michael and nine week old Thomas.[2] At approximately 11:30 P.M., the defendant arrived at Cheryl's apartment in the Dorchester section of Boston. All three children were in bed at that time. Cheryl, who was acquainted with the defendant, admitted him to the apartment. After the two had conversed for a few minutes, Cheryl heard Thomas crying from his room in the rear of the apartment. She went to Thomas, took him into her bedroom, and lay down with him on her bed to rock him to sleep. The lights were off in the bedroom, and Cheryl fell asleep.

Cheryl awakened sometime later that evening to find the defendant, naked, in her bed. The defendant was straddling her and choking her with his hands. Cheryl escaped the defendant's grasp, and a struggle ensued. The defendant again began to choke her, and stated that his mission was to "Kill and destroy" Cheryl and her children. The defendant punched Cheryl, bit her on the face and back, and partially disrobed her. Cheryl finally escaped through the back door, and the defendant followed her.

At that point, Cheryl's brother, Shawn Thompson, arrived at the apartment and found Cheryl and the defendant in the hallway outside the front door. Cheryl told Shawn she was locked out of the apartment, and asked him to enter through

---

[2]The names we have assigned to the victim and her family are fictitious.

a back window. When Shawn entered the apartment, he found the victim lying on the floor in the front room. Shawn saw that she was dead, and fled to the nearby home of their sister. Meanwhile, Cheryl had fled to the home of another relative, where she called the police.

Shawn returned to Cheryl's apartment with their sister, a friend, and the friend's mother. The group arrived to find the defendant, still naked, in the apartment. They proceeded to the back bedroom where they found the victim's body on a bed. The men held the defendant in the apartment until the police arrived.

The medical examiner who testified as to the victim's autopsy results concluded that the cause of her death was asphyxia, and that she had died sometime between 11:20 P.M. and 1:30 A.M. on the night of September 9-10. The autopsy revealed multiple cigarette burns on the victim's chest, a scratch on her forehead, extensive bruising, tearing, and hemorrhaging of her vaginal and rectal areas, several lacerations deep within her vagina, a ruptured vagina, and ulcerations in the lining of her esophagus. The medical examiner further testified that the injuries to the victim's vagina, rectum, and esophagus had been caused by multiple, forceful insertions of a foreign object into those openings, and that those injuries had been inflicted before her death.

1. The defendant filed a motion to dismiss the murder and rape indictments on the ground that the grand jury proceedings had been impaired by improper testimony from a police officer in violation of his rights to due process as guaranteed by the United States Constitution and the Massachusetts Declaration of Rights. Specifically, the defendant contends that Detective Frank Mulvey of the Boston police department's homicide unit, one of several witnesses who testified before the grand jury, unconstitutionally prejudiced the jury against him by stating, in response to a grand juror's question, that a prior warrant had been issued for the defendant's

arrest on an unrelated rape charge.[3] The defendant maintains that this testimony so impaired the integrity of the grand jury proceedings that invalidation of the indictments was required to correct the harm. We disagree.

As a general rule, a court will not inquire into the quality of evidence heard by a grand jury unless "extraordinary circumstances" are present. See *Commonwealth v. Lammi*, 310 Mass. 159, 163-164 (1941). The court has previously identified two such extraordinary circumstances where judicial inquiry is warranted: (1) when it is unclear that sufficient evidence was presented to the grand jury to support a finding of probable cause to believe that the defendant committed the offense charged in the indictment; and (2) when the defendant contends that the integrity of the grand jury proceedings somehow has been impaired. See *Commonwealth v. Mayfield*, 398 Mass. 615, 619-620 (1986). The defendant's claim implicates the second of these situations.[4]

Reference to a defendant's criminal record before a grand jury is clearly undesirable, see *Commonwealth v. Champagne*, 399 Mass. 80, 84 (1987); *Attorney Gen. v. Pelletier*, 240 Mass. 264, 307-308 (1922); *Commonwealth v. Saya*, 14

---

[3]The colloquy between the grand juror and Detective Mulvey reads as follows:

THE GRAND JUROR: "Is it known that this person — we know he has got to be disturbed mentally, mentally disturbed — did he have any record of being so before this?"

THE WITNESS: "Well, we had a rape warrant out for him from the week before. We were looking for him on another rape where he assaulted a woman and beat her bad."

JUROR: "They just didn't catch him on time that he was wanted."

DETECTIVE MULVEY: "The first time, no."

JUROR: "What is the defendant's name?"

DETECTIVE MULVEY: "The defendant's name? Joseph Freeman, F-r-e-e-m-a-n."

After some additional questions, the assistant district attorney who was presenting the evidence to the grand jury terminated the colloquy between the grand juror and Detective Mulvey.

[4]The defendant does not argue, and could not on the record made before the grand jury, that the indictments against him are not supported by sufficient evidence. See *Commonwealth v. McCarthy*, 385 Mass. 160, 163 (1982).

Mass. App. Ct. 509, 515 (1982), and, in some circumstances, such reference may involve "serious risk of prejudice." *Commonwealth* v. *Saya, supra*. This is not such a case. The disputed comments were made in response to a grand juror's question; they were not offered gratuitously by the police officer or by the prosecutor. The reference to the past warrant was generally responsive to the grand juror's question, and did not exceed the scope of that question. The information furnished was not false or deceptive, and there is nothing to show that it was furnished with the intention of obtaining the indictments. See *Commonwealth* v. *Mayfield, supra* at 621. Further, the prosecutor curtailed the line of questioning shortly after it had commenced. We do not discern here any "blatant attempt to whet the jurors' appetite with information which could not serve as a basis for an indictment." *Commonwealth* v. *Saya, supra* at 517 (Brown, J., concurring).

In addition, the defendant has not proved that the disputed statements, viewed in the context of all the evidence presented to the grand jury, "probably made a difference" in their decision to indict him. See *Commonwealth* v. *Mayfield, supra* at 621-622. After Detective Mulvey testified, the jury heard from Cheryl Thompson, the victim's mother. Cheryl testified that she and her three children were home alone on the night in question and that the defendant, with whom she was acquainted, arrived and subsequently tried to strangle her. She described in detail, essentially as recounted above, her ensuing struggle with the defendant, and her subsequent escape and discovery of her daughter's body. The grand jury also heard from a second witness, who described his arrival at the Thompson home and the discovery of both the defendant and the victim's body there. The grand jury had direct and convincing evidence of the defendant's probable guilt of the crimes charged entirely apart from the testimony given by Detective Mulvey. The presence of adequate direct evidence of the defendant's commission of the crimes renders insignificant any arguably improper information contained in the earlier testimony of the investigating police officer. See

*Commonwealth* v. *Ianello*, 401 Mass. 197, 199 (1987) (admittedly improper comments to grand jury held not to require dismissal of indictments when jurors heard abundance of additional evidence which justified indicting defendant). By contrast, the cases in which we have dismissed indictments usually have involved improper statements made by the *sole* witness to appear before the grand jury. See, e.g., *Commonwealth* v. *O'Dell*, 392 Mass. 445, 447 (1984); *Commonwealth* v. *Salman*, 387 Mass. 160, 161 (1982).

The facts of this case closely resemble those in *Commonwealth* v. *Champagne*, 399 Mass. 80 (1987). In *Champagne*, a State trooper testifying before a grand jury commented, in response to a grand juror's question, that the defendant (a prison inmate) had been suspected in other attacks similar to the one under investigation by the grand jury. In analyzing the defendant's claim of prejudice, we emphasized the facts that: (1) the disputed statement was made in response to a grand juror's question; (2) the prosecutor and the witness did not intentionally conspire to present such information to the grand jury; and (3) the prejudicial portion of the testimony was responsive to the juror's question, although inadmissible at trial. See *Commonwealth* v. *Champagne, supra* at 84. Accordingly,. we concluded that the defendant "has not shown that presentation of information that he and others had been suspected of previous attacks on inmates was likely to have made a difference in the grand jury's determination to indict him." *Id.* We reach the same conclusion in this case.[5]

2. The defendant argues that a new. trial is required because the judge did not instruct the jury on involuntary man-

---

[5]The three factors considered important in the *Champagne* case to a question like the one before us all are present here. Furthermore, in this case, unlike *Champagne*, the grand jury received additional testimony from other witnesses which tended independently to furnish a sufficient basis for the indictments. Further guidance is provided by *Commonwealth* v. *Ianello*, 401 Mass. 197, 198 (1987) (prosecutor's statements that defendant was "hot tempered," "knows karate," and is "all muscle" held not to impair integrity of grand jury proceedings), and *Commonwealth* v. *Shea*, 401 Mass. 731, 733 (1988) (evidence on defendant's past involvement with drugs held not to impair integrity of grand jury proceedings).

slaughter or on the issue of criminal responsibility. The defendant did not request any instructions on either subject, nor did he object to the instructions that were given by the judge. The failure of the defendant to raise these points at trial appears to be intentional, in furtherance of his basic trial strategy that the Commonwealth's witnesses were not worthy of belief and that some other person committed the crimes. We consider the arguments, pursuant to G. L. c. 278, § 33E, to ascertain whether there is a substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Lennon*, 399 Mass. 443, 449-450 n.6 (1987). There is no such likelihood in this case.

a. On his manslaughter contention, the defendant directs attention to the decisions which require a judge to instruct a jury on a lesser offense if any view of the evidence in the case, without regard to its ultimate credibility, provides a rational basis for acquitting a defendant of the crime charged and convicting him of the lesser offense. See *Commonwealth* v. *Bellamy*, 391 Mass. 511, 514 (1984); *Commonwealth* v. *Santo*, 375 Mass. 299, 305 (1978); *Commonwealth* v. *LeBlanc*, 373 Mass. 478, 491 (1977); *Commonwealth* v. *Campbell*, 352 Mass. 387, 392 (1967). The defendant theorizes that there is a view of the evidence which provides a rational basis for concluding that the victim's death was manslaughter, not murder. The defendant argues that the evidence does not conclusively establish that the victim was killed by her assailant during the rape. He suggests that the victim may have fallen asleep after the rape and, sometime later, awoke and started crying. At that point, he suggests a pillow may have been placed over her face to muffle her crying and that her ensuing suffocation was unintended.

The hypothesis sketched has no reasonable support in the evidence. The reference to the use of a pillow as the means of suffocation is based on a misreading of the medical exam-

iner's testimony.[6] The evidence shows only that the victim was murdered while she was being brutally raped, sodomized, and burned, or shortly after these acts had been committed. The evidence clearly indicates that the victim's assailant acted throughout with malice. There is no basis to indulge the defendant's speculation that a manslaughter instruction was necessary to avert a possible miscarriage of justice.

b. The defendant argues that the facts of the crime, including the events leading up to it, warrant a conclusion that he was suffering from a "temporary psychotic condition." He maintains, therefore, that the judge was required, sua sponte, to instruct the jury on the issue of his criminal responsibility, and urges that the absence of such instruction creates a substantial likelihood that a miscarriage of justice has occurred. See *Commonwealth* v. *Lennon, supra.*

The defendant maintained, as has been noted, that he was not the assailant, and, consistent with this position, requested no instruction on criminal responsibility. There was no evidence that the defendant had ever suffered from any mental illness. There was no expert testimony on the subject of his criminal responsibility. There was no testimony as to the defendant's state of mind when the crimes were committed. As a result, "there simply [was] no triggering evidence . . . sufficient to require . . . an instruction" on criminal responsibility. *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979). That the crimes were heinous would not alone support a conclusion that they were the product of an insane mind. See

---

[6]On that point, the defendant relies exclusively on the testimony of the medical examiner who testified as to the results of the victim's autopsy. This physician testified that the three year old victim died of asphyxiation, consistent with her mouth being covered for a period of several minutes or with the weight of an adult man being on top of her while raping her. The only reference to suffocation with a pillow occurred under cross-examination, when the physician used that hypothetical example to illustrate a manner in which suffocation could occur without leaving visible injuries on a victim's neck. The medical examiner was neither asked whether the victim was killed in that manner nor did he suggest that she was.

*Commonwealth* v. *Mattson, supra* at 643-644. Compare *Commonwealth* v. *Monico*, 396 Mass. 793 (1986).

3. We have examined the record pursuant to G. L. c. 278, § 33E, and discern no other basis for granting any relief thereunder.

*Judgments affirmed.*