Commonwealth *vs.* Truong Vo Tam
(and a companion case[1]).

No. 98-P-2106.

Suffolk. December 9, 1999. - March 24, 2000.

Present: Perretta, Gillerman, & Lenk, JJ.

*Assault and Battery by Means of a Dangerous Weapon. Practice, Criminal,* Dismissal, Grand jury proceedings. *Grand Jury. Evidence,* Grand jury proceedings. *Probable Cause.*

Evidence presented to a grand jury was not sufficient to establish that the two defendants participated in an alleged criminal assault, and the defendants' motion to dismiss the indictments should have been allowed. [37-41]

Indictments found and returned in the Superior Court Department on March 25, 1997.

Motions to dismiss were heard by *Regina L. Quinlan,* J., and the cases were tried before *David M. Roseman,* J.

*Dennis M. Powers* for Tu Le.

*John A. Amabile* for Truong Vo Tam.

*Karen A. Palumbo,* Assistant District Attorney, for the Commonwealth.

Lenk, J. Truong Vo Tam and Tu Le appeal from the denial of their individual motions to dismiss the indictments charging them with assault and battery by means of a dangerous weapon, to wit, a baseball bat, in violation of G. L. c. 265, § 15A. A jury later found both defendants guilty of the crimes charged. Both defendants argue that the grand jury did not hear sufficient evidence to identify them as the perpetrators.

*Facts.* We view the evidence heard by the grand jury in the light most favorable to the Commonwealth. *Commonwealth* v. *Caracciola,* 409 Mass. 648, 649 n.1 (1991). The evidence was presented in the form of testimony by the victim, his compan-

[1]Commonwealth *vs.* Tu Le.

ions, and a police officer. On December 15, 1996, at approximately 2 A.M., the victim, Mac B. Davis, was walking down Landsdowne Street in Boston toward an Ipswich Street parking lot. He was accompanied by his friends Michael Day, Michael Kelly, Roland Beamish, Courtney Bowers, and Shawna DeLuca (the Davis group). The friends had visited several Landsdowne Street bars and admittedly had consumed varying amounts of alcohol over the course of the evening. As they proceeded down Landsdowne Street, a dark-colored car passed very closely to Michael Kelly.[2] Kelly yelled an obscenity at the car, whose occupants consisted of four males and a female described by the Davis group as "Asian." The car stopped approximately one hundred feet ahead and the occupants got out of the car, carrying an assortment of baseball bats, pipes, and pool sticks. The Davis group asked the bouncers at a nearby bar to call the police, but the bouncers refused to do so and told the group where they could find a pay phone. The car subsequently drove away. Shortly thereafter, the Davis group entered the Ipswich Street parking lot and separated into two groups. Davis, Day, and Kelly headed toward Day's car while Beamish, Bowers, and DeLuca headed toward Bowers's car.

The four men in the Davis group all testified that the same car carrying the Asian individuals then pulled into the parking lot and parked across the only opening to the lot, thereby fencing in the Davis group. The trunk of the car was then popped open from the interior, and four males and a female left the car, grabbing pipes, baseball bats, and tire irons from the trunk. Mac Davis described the five individuals only as "Asian, and their intent was nothing nice." He was unable to describe any of the individuals by height, weight, or size. Davis testified that one of the men approached him and that, even though the parking lot was dark, he could make out that individual's facial features. However, the Commonwealth did not elicit any further testimony from Davis describing or identifying that particular individual.

Davis testified that he attempted to tackle the individual approaching him first but the individual hit him on the head with a pipe, wounding him and causing him to bleed heavily. Davis

---

[2]The grand jury witnesses described the color and make of the car somewhat differently. Day described it as an older, four-door Subaru, Beamish described it as a blue Ford Probe, and Kelly described it as a Ford Probe hatchback. The arresting officer, Officer Gows, described it as a black car.

continued to fight and was able to punch his assailant several times while wrestling him to the ground. However, he was then attacked by another pipe-wielding individual who struck Davis in the back.

Meanwhile, Michael Day was approached by an individual carrying a bat, whom he described as five feet, six inches, to five feet, seven inches, and who was "Chinese or Vietnamese." This individual swung the bat at Day, but Day wrestled the bat away from his attacker and hit him over the head with the weapon. Day testified that the individual who attacked him then fled the scene.

At the same time, Roland Beamish was fighting with another one of the Asian men. Beamish fought with him until he saw that Davis was bleeding and went to his assistance. He also observed Day and Kelly being attacked by the other Asian males. Beamish noted that the Asian female was also carrying a weapon and that she struck a female bystander and then fled the scene as well.

Michael Kelly testified to the same sequence of events. He stated that he was hit in the leg with a pipe by an attacker, but that he was able to wrestle the pipe away and chase off his attacker. He was unable to remember whether he saw his attacker again that night.

At some point, the Davis group was able to get into their two cars, and they attempted to flee the parking lot. However, the assailants returned to their car and again blocked the Davis group's cars.[3] One of the Asian males got out of the car holding a pipe. He began striking Day's car and succeeded in smashing the driver's side rear window. Davis jumped out of Day's car and attacked the individual, pinning him to the ground until the police arrived. Kelly testified that the entire altercation had lasted approximately five to ten minutes, with no verbal exchanges between the groups.

The first Boston police officer on the scene, Officer Roy Gows, testified before the grand jury that he saw the altercation in progress and observed one of four Asian males striking an individual and a car with a baseball bat. The other Asian males were armed with bats and sticks. He testified that he placed

[3]The testimony as to how many Asian individuals were still on the scene at that time was inconsistent. Davis testified that three assailants were in the car before one individual began striking Day's car, and that two left the scene. Day testified that all five assailants got back in the car.

Tuan Pham, who was carrying a baseball bat, under arrest, and that the others left the scene in a black car. Davis, Day, and Beamish all testified that the police did nothing to detain the car. Several members of the Davis group testified that the police arrested the individual with whom Davis had been fighting. Michael Kelly testified that he was unsure if the individual that Beamish and Davis had pinned to the ground was the same individual arrested by Officer Gows; Kelly stated that "they all look the same."

Davis was then taken by ambulance to the hospital, where he received medical treatment.[4] Day testified that he called the police station and requested that an officer come to the hospital to take their statements. Eventually, an officer arrived at the hospital to take statements from the Davis group. In addition, Beamish testified that the police left all of the weapons at the scene. Members of the Davis group picked up the weapons and brought them to the hospital when they accompanied Davis there. According to Beamish, the police never picked up the evidence from the Davis group. Beamish also testified that a police officer told him that he had picked up a driver's license that was lying on the ground at the scene. No driver's license was entered as an exhibit at the grand jury.

Officer Gows testified that several hours after the incident, at about 5 A.M., an Asian female entered the police station where Tuan Pham had been taken in order to bail him out. Officer Gows went outside the station and observed that the vehicle the female had arrived in was the same vehicle with the same license plate that he had observed at the scene of the altercation. He looked inside the car and saw that the occupants, the two defendants and Charlie Dang, all of whom are Asian males, were "pretty badly beaten" and that the occupants had "a lot of facial injuries, injuries on their hands." He also observed a broken pool stick in the car. Officer Gows testified that he asked the car's occupants about the altercation, and that all of them denied being at the scene. He placed all of the occupants under arrest.[5] Officer Gows's testimony established that the defendants were occupants of the car parked at the station. He was not asked whether he saw the defendants at the scene of the assault.

---

[4]Davis received eight stitches in his head and testified at trial that he suffers from dizziness.

[5]The record does not indicate whether the Asian female was ever arrested or charged.

The booking sheets from the defendants' and Dang's arrests were admitted as exhibits during Officer Gows's grand jury testimony. The sheets were not filled out by Officer Gows but by another officer. The booking photos showed no facial injuries to either defendant. In sharp contrast, Charlie Dang's booking photo showed that he had suffered severe facial injuries.[6] In addition, the defendants' booking sheets each state that "no visible injuries" were present. However, Dang's booking sheet listed the following injuries: facial lacerations, a swollen eye, cuts to his finger and left leg, and bruised arms.[7] There was no further testimony as to the identity of the assailants.

Indictments were handed down against the defendants on March 25, 1997. Each was charged with three counts of assault and battery.[8] Both defendants moved to dismiss the indictments. The motion hearing was held on November 19, 1997. The defendants maintained that there was no probable cause to support the indictments since they could not be identified as assailants. They argued that no one in the Davis group had identified them as assailants, nor had any police officers positively identified them. The defendants noted that the facts that they were Asian, that they appeared three hours later at the police station in the same car that was at the scene, and that a broken pool stick was found in the car, were equally consistent with noncriminal activity (such as coming to the station to bail out a friend) as they were with criminal activity. In addition, the defendants pointed out that the booking sheets and photos stated that they had no visible injuries when they were arrested, which directly contradicted Officer Gows's testimony. Finally, the defendants argued that there was no indication in the grand jury minutes as to the actual criminal activity of which they were accused.

The Commonwealth argued that there was adequate probable cause to support the indictments, based on the following facts. The same car that was at the scene appeared at the police station, and a broken pool stick was found in that car. In addition, the same configuration of Asian males and females that was involved in the assault was present at the station: one female

[6]Dang later admitted to being present at the scene of the altercation.

[7]The transcript from the motion hearing describes the injuries listed on Dang's booking sheet.

[8]The defendants were each charged with assault and battery by means of (1) a tire iron; (2) a pool stick; and (3) a baseball bat.

and three males came to the station plus the additional male who had been arrested. Also, Charlie Dang had initially denied being at the scene but later admitted being present. Further, the Davis group was correct on the height of the assailants as being approximately five feet, five inches, to five feet, seven inches. The Commonwealth also argued that Officer Gows had testified that the car's occupants had hand injuries, not just facial injuries. Finally, the Commonwealth argued that the defendants were being charged as joint venturers in the attack.[9]

On January 6, 1998, the motion judge denied the defendants' motions to dismiss the indictments, holding that the evidence before the grand jury was sufficient to support the indictments. She noted that the number of the attackers matched those who came to the police station in the same car not long after the altercation, and one occupant of the car had visible injuries. The motion judge held that the inference drawn by Officer Gows, that the defendants were also involved in the attack, was a reasonable one. Further, she held that there was sufficient evidence to support a joint venture theory as all of the Asian individuals were involved in some aspect of the assault.

The defendants were tried together in a jury trial on January 26 and 27, 1998. They again contested their presence at the scene of the brawl. On January 28, the jury convicted the defendants of assault and battery on Mac Davis by means of a baseball bat.[10] This appeal followed.[11]

*Discussion.* "Generally a court will not inquire into the competency or sufficiency of the evidence before the grand jury." *Commonwealth* v. *Coonan*, 428 Mass. 823, 825 (1999), citing *Commonwealth* v. *McCarthy*, 385 Mass. 160, 161-162 (1982). However, when "a grand jury receives no evidence of criminality on the part of the accused, the indictment must be dismissed." *Commonwealth* v. *Coonan*, *supra*, quoting from

---

[9]"A joint venture exists when the defendant 'was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary.' " *Commonwealth* v. *Cohen*, 412 Mass. 375, 381 (1992), quoting from *Commonwealth* v. *Costa*, 407 Mass. 216, 224 (1990).

[10]The trial judge allowed the defendants' motions for required findings of not guilty on the counts of assault and battery by means of a pool stick and assault and battery by means of a tire iron.

[11]Appeals from a motion to dismiss an indictment may not be brought until after trial. See Mass.R.Crim.P. 13(c)(1), 378 Mass. 872 (1979); *Epps* v. *Commonwealth*, 419 Mass. 97, 99 (1994).

*Commonwealth* v. *Angiulo*, 415 Mass. 502, 510 (1993).[12] "[A]t the very least the grand jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him." *Commonwealth* v. *McCarthy, supra* at 163. *Commonwealth* v. *Badgett*, 38 Mass. App. Ct. 624, 625 (1995). The standard of sufficiency has been defined as "whether the grand jury heard 'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense.' " *Commonwealth* v. *Club Caravan, Inc.*, 30 Mass. App. Ct. 561, 567 (1991), quoting from *Commonwealth* v. *McCarthy, supra. Matter of Ellis*, 425 Mass. 332, 335 (1997). This standard "offers no sure mechanical guide for assessing sufficiency, but it has been employed primarily to strike down indictments in cases where a grand jury has heard no evidence identifying the defendant as the perpetrator of an offense or where the grand jury has heard no evidence whatever that would support an inference of the defendant's involvement." *Commonwealth* v. *Club Caravan, Inc.*, 30 Mass. App. Ct. at 567.

Further, "[p]robable cause requires considerably less evidence than that which is required to support a finding of guilty." *Commonwealth* v. *Clarke*, 44 Mass. App. Ct. 502, 509 (1998). However, probable cause is defined as "more than mere suspicion but something less than evidence sufficient to warrant a conviction." *Commonwealth* v. *Badgett*, 38 Mass. App. Ct. at 625, quoting from *Commonwealth* v. *Roman*, 414 Mass. 642, 643 (1993).

"Our review of the grand jury proceedings is limited to a determination of whether 'the grand jury [heard] sufficient evidence to establish the identity of the accused and probable cause to arrest him.' " *Commonwealth* v. *Clarke, supra* at 509, quoting from *Commonwealth* v. *McCarthy*, 385 Mass. at 163-164. See *Commonwealth* v. *Noble*, 429 Mass. 44, 48 (1999). With this principle in mind, we review the evidence that the grand jury heard against the defendants.

The critical issue here is the sufficiency of the evidence identifying the defendants as being among the assailants. Evidence that they were present at the scene of the assault

---

[12]In addition, a court may review the evidence before the grand jury to determine whether the integrity of the proceedings was impaired. *Commonwealth* v. *O'Dell*, 392 Mass. 445, 446-447 (1984). The defendants do not argue that the integrity of the grand jury proceedings was impaired.

would support probable cause since the grand jury heard sufficient evidence that all of the Asian males at the scene participated in the assault.

The evidence the grand jury heard identifying the defendants as among the assailants was this. They arrived at the police station three hours after the incident in the same car that was seen by Officer Gows at the scene, and Gows observed a broken pool stick inside the vehicle. The defendants were Asian males who, together with the other Asian males present at the station and in the car, made up the same number of males in the group that attacked the Davis group. The defendants were observed by Officer Gows to have "visible injuries." One of the Davis group testified as to the height of their attackers, which description fit the defendants.

This evidence is insufficient to establish that the defendants were the same individuals involved in the altercation. None of the grand jury witnesses were able to describe their assailants other than that they were "Asian" and about five feet, five inches, to five feet, seven inches, tall. The Commonwealth elicited no further identifying characteristics from the witnesses. Officer Gows only identified the defendants as being present at the police station, not at the scene of the assault. Neither defendant admitted to being present at the scene of the assault, unlike Charlie Dang.

Further, the contrast between the defendants' booking sheets and photographs, on the one hand, and Dang's, on the other, is considerable. There is a startling difference between the booking photographs of the car's occupants: the defendants display not a hint of injury, while Dang's photograph shows numerous and severe facial injuries. These are consistent with the booking sheets: Dang's list of "visible injuries" on his booking sheet is extensive, detailing facial lacerations, a swollen eye, cuts to his finger and left leg, and bruised arms, while the defendants' booking sheets state that there are "no visible injuries" to either. The Commonwealth only elicited a blanket description from Officer Gows as to the visible injuries he observed on the occupants of the car. There was no testimony as to the specific injuries he observed on each individual he arrested. The alleged presence of visible injuries was one of the reasons underlying Officer Gows's probable cause to arrest, but the exhibits demonstrate the absence of such injuries to the defendants.

Without this inconsistent evidence as to the defendants' vis-

ible injuries, the Commonwealth is left only with the fact that the defendants are two Asian men who were observed in the same car that had been at the scene. Given the fact that three hours had elapsed between the incident and the car's arrival at the station, this evidence is insufficient and not reasonably trustworthy to warrant the inference that the defendants were the same Asian men who were present at the assault. The defendants' presence was equally consistent with a noncriminal purpose.

Our review of the case law in the Commonwealth concerning motions to dismiss indictments underscores the insufficiency of the evidence against the defendants. Compare *Commonwealth* v. *Coonan*, 428 Mass. at 825-826 (evidence before grand jury that indicted defendant for murder included testimony that defendant was last person to see victim alive; defendant told victim she was welcome to stay at his apartment that night; defendant told witness recently that he wanted to kill someone; defendant was in apartment when victim was murdered; victim was found on defendant's bed; defendant admitted duct tape used to bind victim was his; defendant delayed calling police for three hours). See *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 293 (1992) (evidence before grand jury that defendant was alone with child victim at time victim sustained injuries causing her death and that defendant admitted he killed her); *Commonwealth* v. *Manning*, 44 Mass. App. Ct. 695, 702 (1998) (evidence before grand jury that defendant was identified by the victim of shooting, that victim had previously been acquainted with defendant, and that bullet lodged in victim was of same type used in gun in defendant's possession).[13]

Even in cases where the evidence was less than voluminous,

---

[13]See also *Commonwealth* v. *Roman*, 414 Mass. 642 (1993). In that case, the defendant was indicted for trafficking in cocaine. The trial judge dismissed the indictment on the ground that there was no evidence, other than the defendant's possession of an out-of-State driver's license, that the defendant brought the cocaine into the Commonwealth for distribution. The trial judge was not wrong in dismissing the indictment on that ground, but the Supreme Judicial Court held that the trial judge erred in failing to consider the other aspects of the trafficking statute. The Commonwealth relied on the portion of the statute that included within the definition of trafficking the possession of fourteen grams or more of a controlled substance with the intent to distribute it. *Id.* at 643-644, citing G. L. c. 94C, § 32E(*b*). There was no dispute that the defendant possessed the contraband. *Id.* at 645. Rather, the issue was whether the amount of cocaine he possessed (25.6 grams) was consistent with personal use or whether it supported a finding of probable cause that the defendant

"the grand jury heard evidence which, at the least, wove a thread of identification around the defendant." *Commonwealth* v. *Francil*, 15 Mass. App. Ct. 35, 37 (1982) (grand jury heard evidence that blind robbery victim able to identify robber's voice as taxi driver who had driven him at least seven times; taxi receipts stolen from victim's apartment; accomplices called defendant "John"; only one "John" on taxi company roster). In *Commonwealth* v. *Champagne*, 399 Mass. 80, 83 (1987), the court agreed that the grand jury evidence pointing to the defendant Champagne's involvement in the vicious murder of a fellow inmate was "unquestionably thin." Even so, the grand jury heard evidence that an informant saw Champagne enter the murder scene during the time the incident took place. *Ibid.* The murder indictment was upheld. *Id.* Compare *Commonwealth* v. *McCarthy*, 385 Mass. at 164 (no evidence presented to grand jury that defendant was an accomplice or even that he was present at assault).[14]

We observe that the police had numerous opportunities to establish the defendants' presence at the scene of the assault. According to members of the Davis group, the car carrying the

intended to distribute it. *Ibid.* The court observed that the defendant was a nonresident who was carrying more than the statutory amount of cocaine in his automobile. *Id.* at 648. The court recognized that the question was a close one but held that, since the grand jury needed only evidence sufficient to establish probable cause to arrest, a reasonable inference could be drawn that an individual would not transport such a quantity for personal use, even if that inference would not support the higher standard required for a jury verdict. The court thus reversed the trial judge's order dismissing the indictment. *Ibid.* Unlike *Commonwealth* v. *Roman, supra,* there is here neither sufficient evidence nor a reasonable inference from such evidence to establish probable cause.

[14]Presence alone, however, will not necessarily support an indictment. In *Commonwealth* v. *McCarthy, supra* at 161, the defendant attended a party at which another individual allegedly attempted to rape the victim. The only evidence the grand jury heard as to the defendant's involvement in the crime was the fact that, after the victim escaped from his attacker, the victim's sister entered the house where the party was being held and recognized the defendant among those present. *Ibid.* In dismissing the indictment of the defendant as an accomplice, the court stated that "mere presence at the commission of the wrongful act and even failure to take affirmative steps to prevent it do not render a person liable as a participant." *Id.* at 163-164, quoting from *Commonwealth* v. *Benders*, 361 Mass. 704, 708 (1972). "Only 'one who aids, commands, counsels or encourages the commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal.'" *Commonwealth* v. *McCarthy, supra* at 164, quoting from *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

assailants was allowed simply to leave the scene. The victim and the witnesses were never shown a lineup or brought to a showup that could have included the defendants, despite the willingness of the Davis group to assist in the investigation. No fingerprints were taken from the weapons; indeed, according to the grand jury minutes, the police never obtained the weapons from the Davis group at the hospital.

The sum total of evidence presented to the grand jury was insufficient to identify the defendants as the perpetrators. The judgments of the Superior Court are reversed, the verdicts are set aside, and the indictments are dismissed. See *Commonwealth v. McCarthy*, 385 Mass. at 164.

*So ordered.*