NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11835


COMMONWEALTH  vs.  RONJON CAMERON.



Berkshire.     September 10, 2015. - October 28, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly,
                & Hines, JJ.


Rape.  Deoxyribonucleic Acid.  Practice, Criminal, New trial.



Indictments found and returned in the Superior Court
Department on October 29, 1999.

The cases were tried before Thomas J. Curley, Jr.; a motion
for a new trial, filed on October 8, 2009, was considered by
John A. Agostini, J., and a motion for reconsideration, filed on
January 15, 2013, was also considered by him.

After review by the Appeals Court, 86 Mass. App. Ct. 1113
(2014), the Supreme Judicial Court granted leave to obtain
further appellate review.


Laura Chrismer Edmonds for the defendant.
Joseph A. Pieropan, Assistant District Attorney (Paul J.
Caccaviello, Assistant District Attorney, with him) for the
Commonwealth.
Stephanie Roberts Hartung, for New England Innocence
Project, amicus curiae, submitted a brief.

CORDY, J. In April, 2003, a jury found the defendant, Ronjon Cameron, guilty on two indictments charging rape, in violation of G. L. c. 265, § 22 (b). As part of its case against the defendant, the Commonwealth offered in evidence a laboratory report regarding the presence of seminal residue on the complainant's underwear. The Commonwealth also offered testimony to suggest that there had been a transfer of semen from the defendant onto the complainant's underwear during the rape. Forensic deoxyribonucleic acid (DNA) testing performed before trial indicated the presence of two male sources of the seminal residue on the underwear. Testing as to the primary source excluded the defendant. An expert testified on behalf of the Commonwealth and described the secondary source as both "inconclusive" and as neither including nor excluding the defendant. The defendant was convicted and sentenced to a term of from twelve to sixteen years in State prison.

In October, 2009, the defendant filed a motion for a new trial, which was denied. In January, 2013, he filed a motion to amend and reconsider his motion for a new trial, based primarily on DNA testing performed by an independent laboratory, Bode Technology (Bode). Bode's analysis, using short tandem repeat (STR) testing on sixteen loci,[1] revealed that the secondary

_____

[1] The test employed by Bode is a more discerning test than was available at the time of the trial in 2003.

source, which the Commonwealth's expert had, at trial, attributed to a male donor, was in fact female DNA to which the defendant was excluded as a possible contributor. As part of the same motion, the defendant argued that he had been deprived of the effective assistance of counsel during trial because trial counsel failed (1) to challenge the admissibility of the DNA testimony and (2) to retain a DNA expert to explain that he should have been excluded as the secondary source of the sample at trial. Without a hearing, a Superior Court judge (who was not the trial judge) denied the defendant's motion, concluding that "the defendant has not established that the newly available evidence would 'probably have been a real factor in the jury's deliberations'" (citation omitted). In an unpublished decision pursuant to its rule 1:28, the Appeals Court affirmed the denial, determining that "the defendant has not met his heavy burden of demonstrating that the judge abused his discretion in denying his motion." Commonwealth v. Cameron, 86 Mass. App. Ct. 1113 (2014).

We granted the defendant's application for further appellate review to consider his claim that the newly available DNA evidence warrants a new trial. Given the importance of the existence of a secondary source of male DNA to corroborate the testimony of the complainant that the defendant had raped her, we conclude that the newly available DNA evidence that

conclusively excludes the defendant as a possible donor would likely have been a real factor in the jury's deliberations. That evidence would have cast doubt on the credibility of the complainant and rendered the Commonwealth's strongest corroborative evidence inadmissible. Had the new evidence been available at trial, there is a substantial risk that the jury would have reached a different conclusion. The defendant, therefore, must be given a new trial.[2]

1. Background. The prosecution presented its case primarily through the testimony of the complainant. Defense counsel called only one witness, the defendant. As the Commonwealth acknowledged during closing argument, "[C]learly credibility is at the forefront of this case. Credibility and believability of [the complainant]."

The complainant testified that, on September 13, 1999, the defendant raped her, both vaginally and anally, in the apartment of her then boy friend. She testified that she thought the defendant had ejaculated. After the rape, the complainant put her clothes back on and left the apartment. At the time, the complainant was wearing a dress, white shorts, and underwear.

Two days after the alleged rape, the complainant went to the police station to report the assault. As part of the

---

[2] We acknowledge the amicus brief submitted by the New England Innocence Project.

detective's preliminary investigation, he took the underwear and the dress that the complainant said she had worn on the night of the purported attack.[3]

On September 20, seven days after the alleged rape, the complainant went to a hospital. At the hospital, the complainant was examined by Dr. Mark Liponis. Liponis testified that the complainant reported that the man who raped her had ejaculated, but that she was uncertain as to where he had ejaculated. The rape kit, with Liponis's findings, along with the confiscated clothing, was transported to the State police crime laboratory in Sudbury.

Thomas Sendlenski, a chemist at the laboratory, testified that the underwear showed signs of seminal residue, which was collected for testing. Sendlenski testified that the sample in question could only have been deposited by a male. The sample was sent for DNA testing to Cellmark Diagnostics, a laboratory which has since become Orchid Cellmark (Orchid). Sendlenski also testified about the scientific concept known as "transfer." As he described to the jury, transfer is an exchange of materials between two items that come in contact with one another.

---

[3] The complainant could not find the white shorts she had been wearing.

At Orchid, Kathryn Colombo, a DNA analyst, performed DNA tests on the seminal residue samples collected from the underwear.  Colombo testified that she performed a Y-chromosome STR test with regard to the sample she received.  She reported that the data from that test indicated the presence of DNA from at least two males.  As part of her testimony, Colombo relied on a chart she created in connection with her analysis, which was presented to the jury.  There was a primary source, "of which [the defendant] was excluded," and a secondary source, about which "no conclusion could be made."  Colombo went on to explain:

> "And the secondary source, the fourteen observed at the DYS nineteen is consistent with the standard of [the defendant].  At the three eighty-nine one region, just by a coincidence, [the defendant] has the same type that was observed in the evidence sample, and it could be that that type is present and it's being masked by the primary source.
>
> "There was no type determined or found at the three eighty-nine two region, so we can't draw a conclusion at this region between the standard of [the defendant] and the evidence item.
>
> "And then, at the DYS three ninety region, [the defendant] is a twenty-four.  We obtained just a twenty-one at that region for the evidence.  There is no twenty-four present.  However, we know that sometimes with these systems we may lose types.  So, I -- I'm not saying that we did in this case, I'm just saying that we can't make that determination about the secondary source, we can't make any conclusion about the secondary source." (Emphases added.)

The prosecutor then asked, "So, is the bottom line, as far as the secondary source goes, that your analysis is not able to include him as a donor of seminal material to the underwear nor exclude him?"  Colombo answered, "That's correct."

During cross-examination of the complainant, defense counsel impeached her testimony, challenging her memory of the events of September 13 and her relationship with the defendant, and questioning why it had taken so long for her to report the rape.  The defendant has maintained his innocence throughout these proceedings.  He testified that he did not see the complainant on the day in question, and he denied any sexual contact between himself and the complainant.

2.  Discussion.  The defendant argues that he is entitled to a new trial based on (1) the newly available DNA evidence, excluding him as the source of any of the DNA residue on the complainant's underwear; (2) ineffective assistance of counsel; and (3) the admission of false evidence in violation of his Federal and State due process rights.  When reviewing a lower court's ruling on a motion for a new trial, we "examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion."  Commonwealth v. DiBenedetto, 458 Mass. 657, 664 (2011), quoting Commonwealth v. Grace, 397 Mass. 303, 307 (1986).  See Mass. R. Crim. P. 30(b), as appearing in 435 Mass. 1501 (2001).  "Judges

are to apply the standards set out in Mass. R. Crim. P. 30(b) rigorously," and "grant such a motion only if it appears that justice may not have been done" (quotations and citations omitted). Commonwealth v. Fanelli, 412 Mass. 497, 504 (1992). Where, as in the present appeal, the motion judge "did not preside at trial, we regard ourselves in as good a position as the motion judge to assess the trial record" (quotation and citation omitted). Commonwealth v. Raymond, 450 Mass. 729, 733 (2008).

In order to prevail on a motion for a new trial on the basis of newly discovered evidence, a defendant must meet the two-prong test set out in Grace, 397 Mass. at 305-306. First, the defendant must establish that the evidence is "newly available" or "newly discovered."[4] Commonwealth v. Cintron, 435 Mass. 509, 516 (2001). Grace, supra at 305. Second, the defendant must show that the evidence "casts real doubt on the justice of the conviction." Grace, supra. To show that newly available evidence "casts real doubt on the justice of the conviction," the defendant must show that "there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." Id. at

---

[4] "The standard applied to a motion for a new trial based on newly available evidence is the same as applied to one based on newly discovered evidence." Commonwealth v. Sullivan, 469 Mass. 340, 350 n.6 (2014), quoting Commonwealth v. Cintron, 435 Mass. 509, 516 (2001).

306.  The inquiry is not "whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations."  Id.  The Commonwealth contends only that the defendant has failed to satisfy the second prong.[5]  We therefore only consider whether the motion judge abused his discretion in concluding that the newly available DNA evidence did not cast real doubt on the justice of the defendant's convictions.

The prosecution's case relied almost exclusively on the complainant's testimony.  The only evidence before the jury that had the potential to corroborate the complainant's testimony was the DNA evidence.[6]  The complainant testified that she believed the defendant had ejaculated, and the Commonwealth presented evidence that there were stains on the underwear and then produced expert testimony regarding the DNA testing of those stains.  Taken in conjunction with the testimony elicited by the Commonwealth regarding transfer, the jury could have concluded

---

[5] To be newly available, the evidence must "have been unknown . . . and not reasonably discoverable . . . at the time of trial," Commonwealth v. Grace, 397 Mass. 303, 306 (1986).  A defendant must also "demonstrat[e] that any newly discovered evidence is admissible."  Commonwealth v. Weichell, 446 Mass. 785, 799 (2006).  The motion judge found that the defendant had satisfied these requirements, and the Commonwealth does not dispute that finding on appeal.

[6] Thomas Sendlenski, a chemist at the State police crime laboratory, testified that no seminal fluid or sperm cells were located on any items in the rape kit.  There were also no bodily fluids, hair, or any fibers noted on the dress.

that there was a transfer of semen from the complainant to the underwear in question as a result of a rape.  Although the primary source of the DNA was not the defendant, the evidence of a secondary male source from which the defendant could not be excluded was powerfully corroborative.  Indeed, in his closing argument, the prosecutor made good use of the existence of a secondary source and of the uncertainty of its donor.  Specifically, he explained that "[w]hether or not [the defendant] ejaculated is not relevant to the charges.  But it does put part of the evidence in perspective, because if he did ejaculate, you have to assume a transfer to [the complainant's] underwear.  And while there is a primary source that excludes him, there is another stain there which we can't tell you excludes him and we can't tell you includes him.  We simply can't tell because of the nature of the stain."

Although defense counsel did not object to the admission of the DNA evidence at trial,[7] and indeed attempted to use its

---

[7] Outside the presence of the jury, the trial judge questioned the relevance of the deoxyribonucleic acid (DNA) evidence, given that the secondary sample was "inconclusive." In response, the prosecutor stated:  "Well, I think it -- because there's another -- there's a secondary stain there.  I think that's actually the probative point."  However, during direct examination of Kathryn Colombo, an analyst at Orchid Cellmark, the Commonwealth elicited two transcript pages of testimony about the meaning and makeup of DNA.  During this testimony, the judge requested a sidebar discussion, and questioned the prosecutor as to why he was eliciting such a

uncertainty to the defendant's advantage, we note that, had it been objected to, it should not have been admitted in the form in which it was offered.  In order to weigh effectively the value and admissibility of the DNA evidence at trial, we must first characterize it.  Our recent decisions lend guidance in characterizing DNA evidence and its concomitant potential effect on a jury.

The "admissibility of DNA test results should be determined on a case-by-case basis."  Commonwealth v. Mathews, 450 Mass. 858, 871 (2008).  "Generally, a trial judge is accorded 'substantial discretion in deciding whether evidence is relevant,' and whether relevant evidence should be excluded if it is less probative than prejudicial."  Id. at 872 n.15, quoting Commonwealth v. Talbot, 444 Mass. 586, 589 n.2 (2005).  Our cases distinguish between "nonexclusion" and "inconclusive" DNA testimony.  Evidence that a defendant is not excluded could suggest to the jury that a "link would be more firmly established if only more [sample] were available for testing."  Commonwealth v. Nesbitt, 452 Mass. 236, 254 (2008).  Such evidence "should not [be] admitted without accompanying statistical explanation of the meaning of nonexclusion."  Commonwealth v. Mattei, 455 Mass. 840, 855 (2010).  On the other

response when the defendant was "excluded from one [sample] and from the other sample [Colombo] can't draw any conclusions."

hand, "inconclusive" results "provide no information whatsoever due to insufficient sample material, contamination, or some other problem." Id. at 853. Both the motion judge and the Appeals Court determined that the Commonwealth properly classified the DNA evidence as "inconclusive" rather than nonexclusive. We disagree.

At trial, the Commonwealth, and Colombo, vacillated between referring to the DNA analysis of the underwear stain as "inconclusive" and as not excluding or including the defendant. The latter description goes beyond mere inconclusive results, and permits the jury to make an inference about the defendant's relation to the sample. Moreover, Colombo's testimony added to the risk that jurors would draw such an impermissible inference when she provided the jury with reasons why the defendant's DNA might not have matched the DNA on the underwear. We conclude that the DNA evidence presented by the Commonwealth therefore must be characterized as nonexclusion evidence.

Due to the high risk of prejudice from the admission of inconclusive DNA evidence, the Commonwealth, when presenting expert testimony, should avoid the use of nonexclusion that is not accompanied by a "statistical explanation of the meaning of nonexclusion." Mattei, 455 Mass. at 855. Because there was no such statistical explanation presented by the Commonwealth, the jury were able to draw the inference that a link between the

defendant's DNA and the DNA on the underwear "would be more firmly established if only more [sample] were available for testing."  Nesbitt, 452 Mass. at 254.[8]

The Commonwealth further contends on appeal that it did not rely on the DNA evidence to support the defendant's convictions, as the complainant's testimony did not conclusively establish that the defendant ejaculated.  We disagree.  We also conclude that any prejudice from the admission of the DNA evidence was not cured by defense counsel's cross-examination of the expert witness, his closing argument, or the Commonwealth's concessions made during its closing argument.[9]

---

[8] Even if the evidence had been identified as inconclusive, it was irrelevant and thus improperly admitted.  In Mathews, we determined that, when faced with a challenge to the sufficiency of the Commonwealth's investigation, "the prosecutor is entitled to introduce testimony to demonstrate that [DNA] tests were performed and results (even if inconclusive) were obtained."  Commonwealth v. Mathews, 450 Mass. 858, 872 (2008).  This often turns on whether the defendant pursues a Bowden defense at trial.  See id.  See also Commonwealth v. Bowden, 379 Mass. 472, 486 (1980).  However, in circumstances where the defense is not related to adequacy of the Commonwealth's investigation, "testimony regarding inconclusive DNA results is not relevant evidence because it does not have a tendency to prove any particular fact that would be material to an issue in the case."  Commonwealth v. Cavitt, 460 Mass. 617, 635 (2011).  Here, defense counsel did not raise a Bowden defense, and defense counsel's arguments did not relate to the adequacy of the Commonwealth's investigation.  Instead, defense counsel sought to challenge the credibility of the complainant.

[9] On cross-examination, Colombo admitted that the secondary source "could include or exclude any number of males in this world."  Defense counsel also asked Colombo, "[a]nd you cannot say to even a degree of reasonable scientific certainty that he

The Commonwealth's presentation at trial underscored the importance of the DNA analysis to the case. The theory offered by the Commonwealth in its introduction of the DNA evidence related to the stain was that the existence of a secondary male sample, although not conclusively attributed to the defendant, established that there was a transfer of semen from multiple men to the complainant's underwear during the week in question. From this, the jury were asked to infer that the stain resulted from a semen transfer in the aftermath of what the complainant claimed was a rape. The jury also were permitted to infer that the semen was that of the defendant. Assuming the accuracy of the more recent and sophisticated DNA testing performed by Bode, which attributed the secondary source to a female and excluded the defendant as a possible donor, we conclude that its

is the contributor to the secondary source, is that correct?" Colombo stated that it was correct. During closing, defense counsel stated, "There were two sources, two male sources, neither of which anyone can ever say in a court of law was [the defendant's] samples." Moreover, defense counsel used the DNA results as an argument in favor of the defendant: "I can't emphasize enough the value of DNA evidence in a case of this nature. . . . In this case, you have powerful evidence of the highest caliber, scientific reliability of DNA evidence that exculpates [the defendant]." And, in the Commonwealth's closing, the prosecutor acknowledged: "I'll tell you that the DNA testing is a wash. It's important for a thorough investigation, to be sure, but I'll suggest to you it also lets you know that you need to rely upon other evidence in the case. . . . So, while the DNA evidence may make it easier for you, I suggest to you that you ought not look for the easy verdict. Your obligation is to evaluate all the evidence and apply the law the Court gives you."

availability, coupled with its effect on the Commonwealth's evidence at the 2003 trial, would have been a real factor in the jury's deliberations.

This case is, in many respects, similar to Commonwealth v. Cowels, 470 Mass. 607 (2015), and Commonwealth v. Sullivan, 469 Mass. 340 (2014). In Cowels, the Commonwealth relied heavily on "inconclusive" serological evidence to bolster the testimony of its key witness.[10] Cowels, supra at 610-611, 620. The evidence presented was made up of blood samples taken from towels seized from a bathroom in a witness's apartment. Id. at 611. The defendants had purportedly visited the witness after committing a murder, and washed in his bathroom. Id. at 609. We concluded that the defendants were entitled to a new trial on the basis of DNA testing performed fourteen years after the trial. That testing revealed newly discovered evidence that excluded both the defendants and the victim as the source of the blood on the towels, and that would have eliminated the towels as evidence against the defendants, and could, ostensibly, also have been used as a defense at a new trial. Id. at 618-619. We explained that, "given the towels' role as one of the few pieces of physical evidence that corroborated the testimony of a key prosecution witness whose credibility was sharply challenged,

---

[10] The Commonwealth's expert testified that the blood on the towels "could belong to anybody." Commonwealth v. Cowels, 470 Mass. 607, 611 (2015).

the towels likely were a real factor in the jury's deliberations." Id. at 608. There was "consequently a substantial risk that the outcome of the trial would have been different had the towels been excluded altogether or neutralized" through the introduction of the newly discovered evidence. Id. at 618-619. In that case, the towels, like the underwear here, served as the only physical evidence supporting the key witness's testimony.

In Sullivan, the defendant was convicted of murder in the first degree and armed robbery. Sullivan, 469 Mass. at 340. Two witnesses, one testifying on behalf of the Commonwealth and the other on behalf of the defendant, offered conflicting testimony as to the killing. Id. at 342. The credibility of the Commonwealth's witness was challenged. Id. at 349. The only nontestimonial evidence presented by the Commonwealth to corroborate its witness's account was a purple jacket, which was purportedly worn during the murder. Id. at 345. A chemist testified that blood was found on the cuffs of the jacket, and such blood was "consistent" with that of the victim. Id. Years after the defendant had been convicted, newly available DNA evidence established that the residue on the cuffs was in fact not blood. Id. at 349. We affirmed the allowance of the defendant's motion for a new trial, agreeing with the motion judge that the newly available DNA evidence would have

"eliminated the purple jacket as evidence linking the defendant to the crime, and the defendant would have been able to argue that there was no physical evidence tying him directly to the killing." Id. at 350, 353.

As was the case in Cowels and Sullivan, the value of the newly available evidence in the present case is two-fold. First, the evidence tends to bolster the argument that the DNA test results presented at trial were erroneous, thereby eliminating a piece of evidence that either did or could have linked the defendant to the crime. Second, the newly available DNA evidence could be used at a new trial because it would tend to contradict the testimony and undermine the credibility of the prosecution's key witness, and would transform what had been the prosecution's only physical evidence into evidence on behalf of the defendant. As expressed in Cowels and Sullivan, this dual quality to the newly available evidence renders this case different from many other cases involving newly available evidence. See Cowels, 470 Mass. at 618; Sullivan, 469 Mass. at 352.

When evidence presented to the jury "is more credible than any other evidence on the same factual issue and bears directly on a crucial issue before the jury, such as the credibility of an important prosecution witness," that evidence is likely to function as a real factor in the jury's deliberations. Cowels,

470 Mass. at 620, quoting Commonwealth v. Tucceri, 412 Mass. 401, 414 (1992).

Here, the Commonwealth recognized that the fact that there appeared to be a secondary male source of the semen was consistent with the complainant's testimony that the assailant ejaculated during the rape and that the defendant was the assailant, even if he could not be ascertained to be the secondary source. The new DNA evidence transforms the existence of a secondary source as being consistent with the complainant's testimony to being arguably inconsistent with that testimony, and that may have been a real factor in the jury's evaluation of credibility or, more precisely, whether they were sufficiently convinced of the complainant's credibility to find it true beyond a reasonable doubt. This is particularly so where the evidence presented by the Commonwealth was not overwhelming, and the outcome of the case turned completely on the jury's assessment whether the complainant or the defendant was more credible.

This is not a case in which the newly available DNA testing merely impeaches the complainant's credibility. Rather, the newly available evidence "negates a key piece of physical evidence that the prosecution relied on in arguing that the jury should credit [the complainant's] testimony." Cowels, 470 Mass. at 621, quoting Sullivan, 469 Mass. at 352. This is a case in

which the Commonwealth acknowledges that credibility is at the forefront. There is, therefore, no question that the complainant's testimony is the "linchpin" of the Commonwealth's case. Cowels, supra at 623. The DNA evidence presented at trial acted to tip the balance against the defendant. Had the new DNA evidence been available at the trial, there is a "substantial risk that the jury would have reached a different conclusion." Grace, 397 Mass. at 306.[11]

3. Conclusion. The judgments of conviction are vacated and set aside, and the matter is remanded to the Superior Court for a new trial.

So ordered.

---

[11] In light of this conclusion, we need not reach the defendant's ineffective assistance of counsel and due process claims.